## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN OF TEXAS
## FT. WORTH DIVISION

| | | |
|---|---|---|
| **CHAD WILSON AND MARTHA** | § | |
| **WILSON, INDIVIDUALLY** | § | |
| **and as next friend, for S.W,** | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | |
| | § | **CIVIL ACTION NO.: 4:16-cv-00057-O** |
| | § | |
| **v.** | § | |
| | § | |
| **CITY OF SOUTHLAKE,** | § | |
| **and RANDY BAKER INDIVIDUALLY** | § | |
| | § | |
| | § | |
| | § | |
| **Defendants.** | § | |

## THIRD AMENDED COMPLAINT

**NOW COMES** Chad and Martha Wilson, Individually and as the natural parents and as next friend for their son S.W. (hereinafter collectively referred to as Plaintiffs), brings this their *Third Amended Complaint,* pursuant to Federal Rules of Civil Procedure 15(a), alleging that alleging that the City of Southlake and former Southlake Police Department School Resource Officer Sergeant Randy Baker, Individually, herein collectively termed "the Defendants," violated the various rights of S.W. as more specifically pled herein. Plaintiff's reserve the right to re-plead this *Third Amended Complaint* if new claims and issues arise upon further development of the facts, and as permitted by law. In support thereof, Plaintiffs would respectfully show the following:

## I. <u>INTRODUCTION AND BRIEF REVIEW OF THE CASE</u>

1.  Though the school resource officer (SRO) program in the United States is over sixty years old, the program did not gain prominence until the 1990s in response to various school shootings.

2.  According to national data, SROs can be found in approximately 35 percent of school across America.  They can be found, regardless of level (elementary, middle, or high school), or whether or not the School District is rural, in a small town, is suburban, or in large city.   They are found in the schools regardless of enrollment size.   In fact, most are embedded within a school to assist school administration with anything that would involve a criminal law component such as, the presence of a firearm on campus.

3.  At many schools, an SRO's role is clearly defined and the officer engages with students strictly as part of a community policing project but does not interfere or have any role with administrative discipline.

4.  In certain other schools, one of the SRO's roles is to directly assist with student discipline.

5.  It was in one such elementary school in Southlake, Texas, in January 2014 that SRO Sergeant Randy Baker handcuffed an eight-year old student with Autism, sat him in a chair and engaged in a "yelling match" with him.

6.  At no time did the SRO inquire whether the student had special needs.

7.  At no time were any *Nonviolent Crisis Intervention* strategies enacted or attempted as previously agreed to by the Southlake Police Department, its SROs and the School District.

8.  The incident left the student traumatized and he continues to undergo counseling as a

result.

9.    Ultimately Sergeant Baker's conduct was found to be in violation of Southlake Police

Department policies and after an internal investigation he was terminated from the force.

When he appealed the termination he argued he was never correctly trained by the Police

Department to deal with a child with a disability at all, let alone in a school setting.

## II. <u>NATURE AND PURPOSE OF THIS ACTION</u>

10.   Due to the issues noted above which will be more fully described below, S.W. by and

through his next friends and natural parents, Chad and Martha Wilson, bring forth claims

on his behalf pursuant to the *Due Process Clause* of the Fourteenth Amendment to the

Constitution of the United States, as contemplated by the Civil Rights Acts, 42 U.S.C.

§1983, as well as claims pursuant to Section 504 of the Rehabilitation Act of 1973, 29

U.S.C. §794 ("Rehab Act"), and the Americans Disabilities Act, 42 U.S.C. §12101

("ADA"). The parents have derivative claims for expenses related to the care and

treatment of their son

11.   For any and all of the foregoing, the parents request equitable, remedial and

compensatory damages for S.W., pursuant to these various civil rights acts which

includes but is not limited to damages for past and future emotional anguish,

compensatory services, reimbursement for various out-of-pocket academic and

non-academic expenses, costs of representation including attorney fees and related

taxable and non-taxable costs and other forms of equitable and compensatory relief that

this Court may otherwise provide.

12.   When questioned about the incident Sergeant Blake, purportedly the most experienced officer on the force, noted that he was not given necessary training regarding the use of force with school children, especially those with disabilities

### III. <u>JURISDICTION</u>

13.   Jurisdiction is conferred upon this Court pursuant to 28 U.S.C.A. §1331 and §1343 because the matters in controversy arise under the laws and rules of the United States as noted above.

14.   Finally, this Court has jurisdiction pursuant to Section 1983 and 1988 of the Civil Rights Act, Section 504 of the Rehabilitation Act of 1973 and the Americans with Disabilities Act, so as to also to award attorney's fees, reimbursement of expert fees and other related costs to Plaintiffs.

### IV. <u>VENUE</u>

15.   Under 28 U.S.C. §1391, venue is proper before this Court because the events and omissions giving rise to the Plaintiffs claims occurred in the Northern District of Texas, Fort Worth Division.

### V. <u>PARTIES</u>

16.   S.W. is a citizen of the State of Texas, and Tarrant County, during the time of the incidents giving rise to this Complaint, resided with his natural parents, Mr. Chad and Mrs. Martha Wilson.

17.   Chad and Martha Wilson are likewise both citizens of the State of Texas and residents of Tarrant County and bring forward this complaint accordingly, not only as next friends, but for in their own Individual Capacity for out-of-pocket expenses incurred as a result of Defendant's actions. Their address is 912 Chimney Hill Trail, Southlake, Texas 76902.

18.     Defendant City of Southlake is a municipality organized under the laws of the State of

        Texas and at all relevant times relative to this proceeding was responsible for the

        implementation of relevant federal laws and the rules promulgated thereunder, as well as

        other statutory and constitutional mandates, including but not limited to the care,

        management and control of all business within its jurisdiction, so that citizens like S.W.,

        are treated commensurate with their needs and the law. The City has been served at their

        place of business, City of Southlake, 1400 Main Street, Southlake, Texas 76902 and has

        answered by and through their counsel of record, the Honorable William Krueger of the

        Law Firm, of McNamie, Krueger, LLP, 500 W. Lockhart Drive, Richardson, Texas

        75080.

19.     As the highest ranking officer in his SRO Unit, Defendant Randy Baker was to assure

        that disciplinary measures were applied uniformly and equitably, and to that end assure

        that the *due process* rights of students, like S.W., are protected at the school. He has been

        served and has answered by and through their counsel of record, the Honorable William

        Krueger of the Law Firm, of McNamie, Krueger, LLP, 500 W. Lockhart Drive,

        Richardson, Texas 75080.

## VI. <u>STATEMENT OF FACTS</u>

20.     The Plaintiffs incorporate by reference all the below-related paragraphs with the same

        force and effect as if herein set forth.

A.      ABOUT THE SOUTHLAKE POLICE DEPARTMENT

21.     The Memorandum of Understanding between the Carrol Independent School District and

        the Southlake Police Department provides that the SRO's purpose is to enforce violations

        of the law only, and that SROs do not enforce school rules, nor is their presence used to

*Third Amended Complaint*                                                                      5

"persuade" compliance.

22.     The Agreement for School Resource Officers between the City of Southlake and the Carroll Independent School District states "The City shall provide law enforcement training and certification, basic SRO training, a police vehicle and other police equipment necessary to allow each officer to communicate with the City's Department of Public Safety and other officer. The District shall also provide all SRO officers with CPI training. Prior to requesting assistance with any special needs child, the district shall provide detailed instructions and access to BIP plans, ARD Intervention Plans, and BMP plans for any student where specific assistance is requested.

23.     Texas Education Code §89.1053 provides that restraint only be used in 'emergency' situations in which a child poses a threat of imminent, serious harm to himself or others, or when the threat of an imminent, serious, threat of property destruction exists. The restraint is to be limited to the amount of force reasonable to address the emergency and must be discontinued at the point at which the emergency no longer exists. It further states that no discipline technique should be calculated to inflict injury, cause harm, demean, or deprive the child of basic human necessities. All persons trained to use restraint methods are also trained in de-escalation techniques.

B.      ABOUT S.W.

24.     S.W. is an eleven (11) year old child of Chad and Martha Loren Amaya Wilson ("the Wilsons"). He has an older brother, Alexander, who is thirteen (13) years old.

25.     At the time of the incidents giving rise to this complaint, S.W. was an eight (8) year old student at Carroll Elementary School, in the 2nd grade.

26.     His parents indicated no complications during pregnancy or birth. S.W. was born at

thirty-eight weeks gestation via caesarean section and was released from the hospital, together with his mother, following a typical length of stay. The Wilsons indicate that they had no concerns for his language development or motor milestones as an infant and toddler. As an infant, S.W. always wanted to be held. He slept through the night very early and did not wake on his own to eat. He was toilet trained for both day and night time by three years of age.

27.     Between the ages of two and three years old, Mr. Wilson recalls that S.W. had difficulty separating from him to go to childcare center at the gym. He began attending preschool at three years of age at Harvest Christian Learning Center in Keller, Texas. The Wilsons note that some days were more difficult than others with regard to separation, but that he always enjoyed preschool. No behavioral or developmental concerns were ever raised by the preschool.

28.     His parents also remember that S.W. was a rule follower in preschool and expected others to follow the rules as well. He was observed by the Wilsons to become upset if he felt that others were not following the rules. He also communicated with parents that he was upset when his peers did not pick him for the quiet game.

29.     Mrs. Wilson indicated that he had friends at preschool and each year had one or two children with whom he developed a close relationship. He was invited to birthday parties and interacted well in these settings. Between the ages of three to five, S.W. was rarely left with any caretaker outside the family. He tolerated being left with an aunt or other family member during the few times this occurred.

30.     The Wilsons moved to Southlake just prior to S.W.'s Kindergarten year. Sebastian's home school is Carroll Elementary, but he began Kindergarten at Walnut Grover Elementary

because his brother was enrolled in the Content Mastery II program housed at Walnut Grove.

31.  His parents report that S.W.'s Kindergarten experience was difficult. They felt that he was the target of bullying by another student and was stigmatized due to his brother's behavioral and emotional challenges. Parents reported that S.W.'s Kindergarten attendance was adequate, but was sometimes impacted by difficulties getting his older brother to school. They would often have to take the boys to school separately.

32.  The Wilsons indicate that S.W. exhibited some learning challenges, but he had a new, inexperienced teacher, and they were not informed of these difficulties until the end of the school year. Overall, they described the year as challenging from a social and teacher perspective, but do not feel that S.W. struggled with issues of separation anxiety.

33.  S.W. began 1st grade at Carroll Elementary School and after earning low scores on reading assessments early in the fall it was recommended he participate in the CARE reading program. Regarding peer relationships, his parents indicate that S.W. took some time to warm up, but had developed peer relationships within a few months. Mr. Wilson reported that he had requested S.W.'s participation in a new student group, but this service was never provided.

34.  On October 31, 2012, an Encounter Report had been completed in which S.W. was described as an individual with an Autism Spectrum Disorder defined as Pervasive Developmental Disorder - Not Otherwise Specified (PDD-NOS), Separation Anxiety Disorder, as well as Oppositional Defiant Disorder. He was also one symptom away from meeting the DSM-IV criteria for being diagnosed with Attention-Deficit/Hyperactivity Disorder (ADHD), Inattentive Type. An intervention plan was in place and S.W. was

eligible for services as a special needs child.

C.       S.W. THE SCHOOL DISTRICT AND THE POLICE FORCE

35.      On October 8, 2013 Carroll Elementary School Principal Stacy Wagnon made a report to
         Child Protective Services (CPS) that S.W. had said he "wanted to suicide [sic] himself,"
         and when talking about upcoming birthdays, S.W. had said he "doesn't plan on having a
         next birthday because he is going to suicide [sic] himself."

36.      Ms. Wagnon then contacted the Southlake Police Department regarding the CPS referral.
         She advised Officer Brett Wilson about her concerns involving S.W., an eight year old
         student at the school, and that his parents' had not provided her with information
         regarding what she considered to be sufficient counseling services for some issues he had
         been displaying recently. Due to S.W.'s absence that day Ms. Wagnon requested that
         someone visit the family home to check on the child. Officer Wilson made contact with
         Christopher Mourn, the CPS case worker assigned to the report filed Ms. Wagnon.

37.      On October 9, 2013, Officer Wilson, Sergeant Baker, SRO Slusser, and Assistant District
         Superintendent Julie Thannaum, Ms. Wagnon, and Assistant Principal Angie George met
         to discuss a plan to verify S.W.'s welfare and get help for the family.

38.      That same day, Officer Wilson and Sergeant Baker attempted to contact the Wilson
         family at home, but were unsuccessful. On October 11, 2013, Officer Wilson, SRO
         Slusser, and Sergeant John Stokes did meet with Chad, Martha, and S.W. at their
         residence.

39.      On October 15, 2013 Chad Wilson sent an email to Principal Stacy Wagnon. The purpose
         of such was to inform Ms. Wagnon of S.W. current issues and that he was under the care
         of a psychologist and psychiatrist for depression, anxiety and Asperger's Syndrome, and

that more testing was being conducted regarding S.W.'s difficulties. He requested notification of what plans and accommodations would be put into place for S.W. Mr. Wilson further inquired regarding meetings that had been occurring between school staff and the school diagnostician and psychologist, as well as a meeting with Child Protective Services. He Wilson's had not been contacted nor consulted regarding the basis for holding these meetings or for any input into or information with account to the concerns the school may have about S.W.

D.      THE INCIDENT IN QUESTION

40.     On January 23, 2014, Ms. Wagnon saw S.W.'s family pull up to the school. S.W. was returning to school after a lengthy absence. Wagnon was going to have S.W. work in her office that day because of a prior incident for which he received an in-school suspension (ISS).

41.     At 9:08 a.m. the Wilsons along with S.W. enter the Carroll Elementary School (CES) building. At 9:18 the Wilsons leave without S.W.

42.     As soon as Ms. Wagnon led S.W to her office, he began indicating that he would not cooperate with her and began making rude remarks. Ms. Wagnon asked Jennifer Bailey to help with S.W. and they attempted to have S.W. work on a math assignment. Ms. Baily recounts that S.W. indicated he had access to his father's guns.

43.     S.W. was working on classwork that he was unfamiliar with, and was distressed by working on schoolwork he was unfamiliar with while not having a teacher present to assist him. This coupled with his dysgraphia triggered S.W.'s anxiety.

44.     Ms. Wagnon offered to help S.W. with his assignment and S.W. reacted violently. He was increasingly visibly upset and proceeded use obscenities crumple up the papers on his

table, and throw them and his pencil.

45.   Ms. Wagnon requested that Officer Robert Slusser, the SRO assigned to Carroll Elementary, come to her office. SRO Slusser arrived and positioned himself outside of her office door while Ms. Wagnon supervised S.W.

46.   Next Ms. Wagnon asked S.W. to read, he threw the book off his table and stated that [he] "brought something in my backpack," adding that it was for "self-defense". Ms. Wagnon then indicated that S.W. was going to have to leave school and asked that his parents be called to get him.

47.   An attempt was made to search his backpack, at which time he threw a cup of coffee and produced what S.W. called "home-built nun-chucks," which was actually a jump rope.

48.   SRO Slusser radioed Sergeant Randy Baker, the highest ranking officer in the school district's SRO Unit, for backup.

49.   Ms. Wagnon also told him that she would ask SRO Slusser to take it if S.W. did not relinquish it. S.W. then ran into the hallway and Ms. Wagnon pursued, ordering S.W. to go back into the office.

50.   At 9:47 a.m. Sergeant Baker entered the CES building and immediately handcuffed S.W. and took the "nun-chucks" away from him.

51.   After he handcuffed S.W., Sergeant Baker struggled with him as he removed the student from the hallway and returned him to Ms. Wagnon's office. Sergeant Baker sat S.W. in a chair and then sat in a chair close to and directly facing the student.

52.   Shortly thereafter Sergeant Baker was heard very loudly screaming at S.W. and interacting with him in an aggressive manner, very close to his person.

53.   Sergeant Baker proclaimed, "You want to act like a punk, this is what happens to little

punk kids." S.W. screamed, and Baker shouted, "You don't hit cops, you don't hit teachers. You understand? Sit down."

54.   S.W. shouted, "I hate you!" and Sergeant Baker responded, "I don't care! You ain't gonna hit me! You understand that?" To which S.W. shouted "Fuck. Fine."

55.   S.W. shouted unintelligibly, and Sergeant Baker responded, "Shut your mouth! Quit cussing!"

56.   "Because you act like a little brat kid. Look what you've done. Look at all of this. How can this school give you an education whenever you're gonna sit here and tear everything up? Flipped desk, hit the principal, spill hot coffee on someone. How can the school give you an education?! They can't!"

57.   S.W. shouted an unintelligible statement, indicating someone "started it!"

58.   Sergeant Baker responded that the teacher is "trying to teach you? How did she start it?" S.W. replied with unintelligible shouting. Baker forcefully replied, "because of what you did the last time, when you hit the teacher, and when you hit the principal, and when you hit the cop." S.W. screamed. Sergeant Baker then said, "It don't work like that in the real world, young man. You better calm yourself down."

59.   S.W. responded, "I can't!" S.W. then restated, "The school has broke [sic] the law." Baker responded conversationally, "You're wrong. I hate to be the bearer of bad news." S.W. shouted, "You know what, I hate police." Sergeant Baker replied, "Why? Because we're not gonna allow you to run amok and hit people, including us."

60.   S.W. then appeared to protest the handcuffs with unintelligible shouting. Sergeant Baker asked, "What? What? I can't understand you." S.W. again shouted something unintelligible, and Sergeant Baker answered, "Oh, from restraining your hands? That's

extreme? That's called handcuffs. You know what. Have you tried to hit me?"

61.   At this point, S.W. shouted something about "my mom," and Sergeant Baker interjected, "I don't care what your mom says."

62.   At this point the SRO and other member of the school's staff attempted to intervene and deescalate the situation. Sergeant Baker ultimately ignored these attempts and continued to engage the child in manner that only served to further aggravate the situation.

63.   A female, presumably school staff, quietly told S.W. to "calm down" When S.W. responded, shouted, "I can't."

64.   Several seconds later, S.W. muttered something unintelligible, and Sergeant Baker responded, "What?" S.W. screamed that he would "blow up the entire school."

65.   Sergeant Baker again warned S.W. "She's trying to wipe the snot from your nose and the tears from our eyes, and you're gonna try to kick her." Sergeant Baker said," then you can have snot in your nose and tears from your eyes." S.W. retorted, "You're making it worse," and Sergeant Baker said, "Okay."

66.   SRO Slusser then added, "We can't understand you when you are screaming. Talk normal." S.W. shouted, "I can't." SRO Slusser persisted, "Yes, you can." S.W. again replied, "I can't." S.W. Screamed, "Just stop it. I can't talk normal when I'm in handcuffs. Sergeant Baker responded, "Well, you're gonna be in handcuffs because you've already proven you can't be without restraint."

67.   S.W. then explained, "You don't know what this school has done to me." Sergeant Baker offered, "I know they tried to educate you and give you the best education possible. But you don't allow that to happen."

68.   Sergeant Baker then spoke with another person about taking S.W. home when the student

claimed he had "hit a possum with these nun-chucks." Sergeant Baker responded, "Well a

possum and a squirrel is not a human being. You understand?"

69.     S.W. then said something unintelligible and Sergeant Baker said, "No, it's not. Under

CCP (presumably Code of Criminal Procedure). Look that up when you get home."

70.     Sergeant Baker then spoke with someone on his radio. S.W. shouted at Sergeant Baker

for laughing while on his radio, and Sergeant Baker responded, "I'm talking on my

radio." S.W. shouted "You think this funny," and shouted something unintelligible.

71.     At 10:06 a.m. the Wilsons return to the CES building.

72.     When Marth Wilson saw S.W. in handcuffs she demanded Sergeant Baker release him.

Chad Wilson also demanded that Sergeant Baker remove the handcuffs and claimed that

other Officers had been at the Wilson home "intimidating" them.

73.     Sergeant Baker ordered Mr. Wilson to move from behind him and to talk to SRO Slusser.

74.     At this point, S.W. screamed, "Just kill them. Just kill them already."

75.     Mrs. Wilson then said, "He has autism...he's eight years old...you handcuffed and

eight-year-old." Sergeant Baker proclaimed, "Absolutely I did."

76.     Mrs. Wilson asked, "How long has he been handcuffed?" Sergeant Baker said, "Fifteen

minutes, until you got here." Mrs. Wilson then said, "You do realize this completely

traumatizes him."

77.     S.W. shouted at this point. However, it appears Sergeant Baker responded, "You know

what? You're right, I don't know that. I'm not a psychologist." Mrs. Wilson stated,

"There are other ways," to which Sergeant Baker responded, "That was the only way."

78.     Over the next three minutes, Mrs. Wilson and S.W. yelled at Sergeant Baker for laughing,

Martha demanded Sergeant Baker's information, and Sergeant Baker demanded that the

Wilsons leave the school.

79. Sergeant Baker continued to engage all parties, including S.W., in a hostile and antagonistic manner, making the comment "Great parenting!", and also laughing as S.W. had another outburst while his mother tried to guide him out of the school office.

80. At 10:12 a.m. the Wilsons leave the CES building with S.W. being carried by his father.

81. At no time during the incident were the *Nonviolent Crisis Intervention* (NCI) strategies employed. Additionally, the working agreement, per the Crisis Prevention Institute (CPI), between Southlake Police Department and the Carroll Independent School District was not followed. That agreement states:

> Prior to requesting assistance with any special needs child, the district shall provide detailed instructions and access to BIP plans, ARD Intervention plans, and BMP plans for any student where specific assistance is requested. Such instruction and any desired methods of intervention shall not restrict an officer's method of response during investigations of criminal activity or response to violent behavior that violates criminal laws.

> SRO Officers shall not enforce any school "house rules" nor shall they allow themselves or their uniform to be used to "persuade" youth to comply with rules, except that SRO Officers may, at an Administrator's request, issue verbal warnings to students violating school rules and report such violations to the Administration for follow-up.

> When the School Administrators discuss school disciplinary matters with students or parents SRO Officers may be requested to preserve the peace. While in that capacity, a School Resource Officer will not intervene unless a criminal violation is identified or observed.

82. Sergeant Baker's spontaneous "intervention" with S.W. was neither requested by school administrators nor was it remotely congruent with the agreement between CISD and Southlake Police Department.

83. The impact of Sergeant Baker's actions on S.W. are described by his counselor, Gena Tidwell, LPC, who states:

[S.W.] has been diagnosed with Autism, Mood Disorder, Not Otherwise Specified, and Post-Traumatic Stress Disorder as defined in the Diagnostic and Statistics Manual, 5th Edition. Whereas the diagnosis of autism existed prior to the incidents and police involvement at the elementary school and within the Wilson's home, the autism symptoms, mood disorder, and PTSD have been unequivocally intensified as the result of these punitive and harmful occurrences.

E.     TEXAS USE OF RESTRAINT

84.    It is the policy of the State of Texas to treat all students, including students with disabilities, with dignity and respect. Toward that end the Legislature enacted a statute that places parameters on the use of confinement, restraint, seclusion, and Time-Out as either discipline management practices or behavior management techniques. Tex. Educ. Code § 37.0021; 19 Tex. Admin. Code § 89.1053(a).

85.    In Texas, "restraint" means the use of physical force or a mechanical device to significantly restrict the free movement of all or a portion of a student's body. Tex. Educ. Code § 37.0021(b)(1); 19 Tex. Admin. Code § 89.1053(b)(2). The statue requires a set of procedures for the use of restraint by school district employees. Those procedures must be consistent with professionally accepted practices and standards of student discipline and techniques for behavior management and relevant health and safety standards. The procedures must identify any discipline management practice or behavior management technique that requires training before a school district may use the practice or technique. Tex. Educ. Code § 37.0021(d)(1)(2).

86.    According to 19 Tex Admin. § 89.1053(c)(1-4), the use of restraint in Texas is limited to "an emergency" and further limited as follows:

       a.     Restraint is limited to the use of such reasonable force as is necessary to address the emergency;

b.     The use of restraint shall be discontinued at the point at which the emergency no longer exists;

c.     Restraint shall be implemented in such a way as to protect the health and safety of the student and others; and,

d.     Restraint shall not deprive the student of basic human necessities.

87.     A core team of personnel on each campus must be trained in the use of restraint. The team must include a campus administrator or designee and any general or special education personnel likely to use restraint. 19 Tex. Admin. § 89.1053(d)(1)(2). Training on the use of restraint must include prevention and de-escalation techniques and provide alternatives to the use of restraint. 19 Tex. Admin. §89.1053(d)(3). The training must include instruction in professionally accepted practices and standards regarding behavior management and the use of restraint. Tex. Admin. § 89.1053(e).

F.     INVESTIGATIONS OF SGT. BAKER BY SOUTHLAKE POLICE DEPARTMENT

a.     Complaint of Not Following Policies

88.     On November 23, 2011, Sergeant Baker told Officer Thomas to complete an information report and to either "leave the drugs at the residence or to flush them down the toilet"

89.     Sergeant Baker's actions were determined to be against SPD policy.

b.     Complaints of Racial Discrimination & a Hostile Work Environment

90.     On January 17, 2012 at approximately 8:45 p.m. Sergeant Andrew Anderson called Officer "Nate" on his cell phone to discuss an incident involving Sergeant Baker.

91.     Officer "Nate" related the fact that Sergeant Anderson became upset and emotional stating, "Nate, I know that he has made racial comments about you and I'm tired of it. It's time that we put this to an end." Sgt. Anderson stated that during a conversation…[Sgt.

Baker] made the statement that "Nate is nothing but a loud mouth uppity nigger."

92.   A third incident occurred when Officer J. Luna reported that Sergeant Baker had made comments about Officer "Nate" in Officer Luna's and Cpl. K. Diehl's. According to the Officers, Sergeant Baker made a racial comment towards Officer "Nate", which resulted in Officer Luna removing himself from the atmosphere and becoming upset.

    c.   Complaint of Unbecoming Conduct, Unsatisfactory Performance, Courtesy, Treatment of Persons in Custody or Patient Care

85.   After the incident with S.W. on January 23,2014, a formal Internal Affairs Investigation was made regarding Sergeant Baker's actions. "The Summary of Complaint and Allegation(s) of Misconduct stated that he had violated Southlake Police Department policies regarding Unbecoming Conduct, Unsatisfactory Performance, Courtesy, and Treatment of Persons in Custody or Patient Care." The review was conducted beginning January 31, 2014 and included interviews of SRO Slusser, Ms. Wagnon and Sergeant Baker.

86.   In the *Internal Affairs Investigation Report* completed by the Southlake Department of Public Safety.

87.   During interviews conducted regarding the incident, SRO Slusser made the following report:

> SRO Slusser advised that Sergeant Baker sat down in a chair across from Sebastian. SRO Slusser advised that initially he was standing nearby, but at some point he went to locate the principal, Ms. Wagnon, who was visibly upset. During this time, SRO Slusser heard some words exchanged between Sebastian and Sergeant Baker, after which the two began a "shouting match" with each other. When SRO Slusser returned to the principal's office, he observed Sergeant Baker and Sebastian both leaning toward each other, approximately a foot or so apart. SRO Slusser advised that Sergeant Baker's face had turned red and he looked angry. SRO Slusser stated that he did not pay any close attention to what was being said, as he was still in the process of checking on Ms. Wagon, but he did

recall Sebastian yelling about not getting a quality education and Sergeant Baker responding by yelling back that Sebastian's actions were preventing him from receiving an education. SRO Slusser stated that Sergeant Baker's interaction with Sebastian "... almost looked like Sergeant Baker was screaming at his son... taking it personal." Other than Sergeant Baker and Sebastian shouting at each other, SRO Slusser did not recall any other comments made by Sergeant Baker to Sebastian.

Even after Sergeant Baker's shouting subsided, he periodically made comments to the student that were unnecessary, unprofessional, and unproductive, particularly considering the student's age and current state of mind. These comments did not de-escalate the situation, and, in some portions of the audio-recording, they appeared to aggravate it somewhat. One example of was Sergeant Baker's response to the student's statement, "this is illegal" in which Sergeant Baker told the student to "look it up in the CCP (Code of Criminal Procedure) when you get home."

88.    When Ms. Wagnon was interviewed she stated that Sergeant Baker handcuffed S.W. and for a lengthy period screamed in very close proximity to his person. She characterized his interaction as appearing to take the incident personally and stated that he had "lost his temper".

89.    Further, during a Professional Standards interview Sergeant Baker's initial claim was that he had used a "command presence with an elevated voice" to speak to S.W. However upon further questioning he admitted that he had heard himself on the in-car audio recording and that it did in fact sound like he had lost his temper. Sergeant Baker also admitted to using an elevated voice while sitting in very close proximity to S.W. The review of the in-car recording by the Investigator substantiated the claims regarding his behavior and level of volume.

90.    In the hand-written notes taken by Lieutenant Ashleigh Douglas during her interview with Sergeant Baker, she notes that Baker stated that "he was never trained for an event like this".

91.    Ultimately Sergeant Baker's conduct was found to be in violation of Southlake Police

Department policies and after the internal investigation he was terminated from the force for Allegations of Misconduct including, Conduct Unbecoming, Unsatisfactory Performance, a violation of the Courtesy code and the code regarding Treatment of Persons in Custody or Patient Care.

92.     Chief of Police Stephen Mylett notified Sergeant Baker on February 7, 2014 of the findings of the investigation and that the findings concluded that Sergeant Randy Baker had "engaged in unprofessional and unreasonable conduct while interacting with" S.W. Chief Mylett termed Sergeant Baker's behavior as "inexcusable" and in the Memorandum discussing the decision, he referred to Sergeant Baker's interaction with the student as "unprofessional and unreasonable" citing that he was "demeaning, berating and antagonizing towards the student" (S.W.). He concluded by warning Baker that he was considering termination of is employment and informed him that he had until February 10, 2014 at 1 p.m. to respond to the allegations

93.     In a memorandum dated February 10, 2014 Chief Mylett advised Randy Baker that he was terminated effective immediately due to the incident on January 23, 2014.

G.      POST-SCRIPT

94.     S.W. has and to this date continues to receive counseling. As previously noted, the family's counselor, Gena Tidwell-Haley, LPC has concluded that S.W.'s current functioning behavior is a result of Autism, Mood Disorder, Not Otherwise Specified, and Post-Traumatic Stress Disorder as defined in the Diagnostic and Statistics Manual, 5th Edition. Whereas the diagnosis of Autism certainly existed prior to the incidents and police involvement at the elementary school and within the Wilson's home, the Autism symptoms, mood disorder and PTSD have been unequivocally intensified as the result of

the occurrences of January 23, 2014.

95.     Further, S.W.'s counselor, who has been in practice for more than 18 years specializing in

        Autism, Mood Disorders, and PTSD has concluded that therapy weekly for S.W. as well

        his parents for at least the next 12 months at a minimum along with medication and

        continued collaboration with other healthcare professionals will be required.     Continued

        therapy after stabilization will be necessary for an additional period of 6-12 months.   She

        believes that S.W. should not return to the school environment in which the

        traumatization occurred in order to protect them from re-traumatization. S.W.'s parents

        note that simply driving past Carroll Elementary or passing a police vehicle triggers a

        negative emotional response. The counselor's professional opinion is that "This family is

        in crisis as the result of the mishandling of the entire situation."

## VII. STATE ACTION

96.     Plaintiffs incorporate by reference all the above-related paragraphs, as well as those

        below, with the same force and effect as if herein set forth.

97.     The Southlake Defendants, in any Official and Individual Capacities and in all matters

        were acting under color of state law when they subjected S.W. to the wrongs and injuries

        set forth herein.

## VIII . UNCONSTITUTIONAL POLICIES, PROCEDURES , PRACTICES & CUSTOMS AND VIOLATION TO DUE PROCESS CLAUSE OF THE 14th AMENDMENT TO THE UNITED STATES CONSTITUTION

98.     Plaintiffs incorporate by reference all the above related paragraphs, as well as those

        below, above with the same force and effect as if herein set forth.

99.     Plaintiffs more specifically contend that the Southlake Defendants failed to sufficiently

train staff, like Sergeant Baker, in addressing the needs of a student with a disability like S.W., thereby violated his rights pursuant to the Fourteenth Amendment of the Constitution of the United States for which S.W. seeks recovery pursuant to 42 U.S.C. §1983.

100.    Plaintiffs contend that the Southlake Defendants failed to sufficiently supervise staff, like Sergeant Baker, in addressing the needs of children in general and especially a student with a disability like S.W. Such failure was the moving force in violating the rights of S.W. rights pursuant to the Fourteenth Amendment of the Constitution of the United States for which S.W. seeks recovery pursuant to 42 U.S.C. §1983.

101.    Furthermore, during the relevant time period contemplated by this cause of action, the Southlake Defendants by and through their designees, including Sergeant Baker, did not follow both federal and state law, federal and state regulations, federal and state executive agency directives in regard to the treatment of a child with emotional and behavioral issues like S.W., and such failure was a moving force in the injuries to him.

102.    During the relevant time period contemplated by this cause of action, the Southlake Defendants by and through their designee, Sergeant Baker had an actual policy, practice and custom of conscious and deliberate indifference to federal law, federal and state administrative directives, and School Board policies and procedures in regard to the treatment of S.W. and such failures were a moving force in the injuries to S.W. for which S.W. seeks recovery pursuant to 42 U.S.C. §1983.

## X. VIOLATIONS OF THE FOURTH AMENDMENT TO THE US CONSTITUTION

103.    Plaintiffs incorporate by reference all the above related paragraphs, as well as those below, with the same force and effect as if herein set forth.

*Third Amended Complaint*                                                                                     22

104.    Plaintiffs contend that the acts and omissions of the Southlake Defendants violated the rights of S.W. pursuant to the Fourth Amendment of the Constitution of the United States for which S.W. seeks recovery pursuant to 42 U.S.C. §1983.

105.    Plaintiffs contend that the acts and omissions of Sergeant Baker violated the rights of S.W. pursuant to the Fourth Amendment of the Constitution of the United States for which S.W. seeks recovery pursuant to 42 U.S.C. §1983, as such the seizure of S.W. was unreasonable in light of the totality of the circumstances The United States Constitution protects children like S.W. against unreasonable seizures and excessive force. The reasonableness of a particular seizure depends not only on when it is made but how it is carried out. Whether a seizure is unreasonable and unconstitutional depends on the totality of the circumstances.

106.    In addition the force used was also excessive. These circumstances include, but are not limited to the age, size and disability to form criminal intent, and the limited ability to impose actual harm. After the police made their presence known; that the child was experiencing behavioral problems directly related to the child's disability; that the School Resource Officer places handcuffs for adults on a child; that the length of the time the handcuffs were used was unreasonable and unnecessary; that the child was treated with unnecessary force; that the child was treated with onimus, all violates not only the law, but standards of care set by the Southlake Police Department.

### XI. CLAIMS FOR RELIEF PURSUANT TO THE REHABILITATION ACT OF 1973

107.    Plaintiffs incorporate by reference all the above-related paragraphs with the same force and effect as if herein set forth.

108.    Due to his status as a special education student, S.W. likewise is deemed "an individual

with a disability" pursuant to Section 504 and its implementing regulations and directives.

109.    The City of Southlake receives federal monies, at least in part.

110.    Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. §794 and its implementing regulations require that each state that receives disbursements, including the state's political subdivisions such as cities and their local police departments, must ensure all individuals with disabilities, especially children, are given appropriate and necessary accommodations and modifications, pursuant to federal law and rules. To the degree that a policy or practice hinders honest consideration of a disabled child's unique needs, and fails to accommodate that child's disability, it violates Section 504.

111.    Plaintiffs assert that because the City of Southlake failed to provide S.W. an environment that was not hostile, such failures as noted above, have, together and separately, contributed to violating his rights pursuant to Section 504, and the federal rules and regulations promulgated pursuant thereto, upon which S.W. seeks recovery accordingly.

112.    Further S.W. was a victim of retaliation by the City of Southlake, by and through Office Baker who retaliated against S.W. because of his vocal outbursts undertaken on his own behalf. Such retaliation likewise contributed to violating his rights pursuant to Section 504, federal rules and regulations promulgated pursuant thereto, upon which S.W. seeks recovery accordingly.

**XII. <u>CLAIMS PURSUANT TO THE AMERICANS WITH DISABILITY ACT</u>**

113.    Plaintiff incorporates by reference all the above related paragraphs with the same force and effect as if herein set forth.

114.    The facts as previously described demonstrate violations of the Americans with

Disabilities Act, 42 U.S.C. §12131, et seq ("ADA").

115.   Due to his status as a special education student, S.W. likewise is deemed a "qualified individual with a disability" as defined in 42 U.S.C. §12131(2) as he has an emotional disability that affects his major life activities.

116.   The City of Southlake is deemed a "public entity" as defined in 42 U.S.C. §12131(1), and receives federal financial assistance so as to be covered by the mandate of the ADA.

117.   The Southlake Police Department is deemed a "public entity" as defined in 42 U.S.C. §12131(1), and receives federal financial assistance so as to be covered by the mandate of the ADA.

118.   Further, both provide a facility whose operation constitutes a program and services for ADA purposes.

119.   In addition, and in the alternative to the above, the Southlake Defendants failed to reasonably modify and accommodate the programs and services offered to S.W. for example the use of crisis intervention, de-escalation and patience. Such acts and omissions noted above rise to level of intentional discrimination, violating the Americans with Disabilities Act thereby upon which S.W. seeks recovery accordingly.

## XIII. <u>RATIFICATION</u>

120.   Plaintiffs incorporate by reference all the above-related paragraphs, as well as those below, with the same force and effect as if herein set forth.

121.   The City of Southlake ratified the acts, omissions and customs of Policed Department personnel and staff.

122.   The Southlake Police Department ratified the acts, omissions and customs of their personnel and staff.

123.   As a result the Southlake Defendants are responsible for the acts and omissions of staff who were otherwise responsible for the safety of S.W.

## XIV. PROXIMATE CAUSE

124.   Plaintiffs incorporate by reference all the above related paragraphs, as well as those below, with the same force and effect as if herein set forth.

125.   Each and every, all and singular of the foregoing acts and omissions, on the part of the Southlake Defendants, taken separately and/or collectively, jointly and severally, whether in any official or individual capacity, constitute a direct and proximate cause of the injuries and damages set forth herein.

## XV. DAMAGES

126.   Plaintiffs incorporate by reference all the above-related paragraphs with the same force and effect as if herein set forth.

127.   As a direct and proximate result of the all the Defendant's conduct, S.W. and his parents have suffered injuries and damages, for which he is entitled to recover within the jurisdictional limits of this court, including but not limited to:

a.      Mental anguish in the past;

b.      Mental anguish in the future;

c.      Physical injuries in the past;

d.      Loss of educational opportunities; and

e.      Various out-of-pocket expenses incurred by his parents but for the acts and omissions of the Southlake Defendants.

## XVI. PUNITIVE DAMAGES

128.   Plaintiffs incorporate by reference all the above-related paragraphs, as well as those

below, with the same force and effect as if herein set forth.

129.   Plaintiffs reasonably believe the acts and omissions of Defendant Baker not only satisfy criteria for violations of civil rights and discrimination based upon disability but shock the conscience, thus satisfying criteria for punitive damages, as contemplated by Section 1983.

## XVII. ATTORNEY FEES

130.   Plaintiffs incorporate by reference all the above related paragraphs, as if fully set forth herein.

131.   It was necessary for Plaintiffs to retain the undersigned attorneys to file this lawsuit. Upon judgment, Plaintiffs are entitled to an award of attorney fees and costs pursuant to under 42 U.S.C. §1988(b), 42 U.S.C. §794a and all pursuant to 42 U.S.C. § 2000d et seq.

## XVIII. DEMAND FOR JURY TRIAL

132.   Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a jury trial for all issues in this matter.

## PRAYER

**WHEREFORE, PREMISES CONSIDERED**, Plaintiffs pray for judgment against all Defendants, jointly and severally, in the manner and particulars noted above, and in an amount sufficient to fully compensate them for the elements of damages enumerated above, judgment for damages, recovery of attorney's fees and costs for the preparation and trial of this cause of action, and for its appeal if required, pursuant to 42 U.S.C. §1988 and 42 U.S.C. § 2000d et seq.; together with pre- and post-judgment interest, and court costs expended herein, as well as the equitable issues noted above; and for such other relief as this Court in equity, deems just and proper and for such other relief as the Court may deem just and proper in law or in equity.

Respectfully submitted,

/s/ Martin J. Cirkiel
Mr. Martin J. Cirkiel, Esq
marty@cirkielaw.com [Email].
Texas State Bar Number 00783829
Federal ID 21488

Cirkiel & Associates, P.C.
1901 E. Palm Valley Boulevard
Round Rock, Texas   78664
(512) 244-6658 [Telephone]
(512) 244-6014 [Facsimile]; and

Kenneth Carden, Esq., Local Counsel
Texas State Bar Number 03787300
carden.ada.law@gmail.com [Email]
CARDEN LAW OFFICE
1409 S. Lamar Street, Apt. 601
Dallas, Texas 75215
(214) 485-3535 [Telephone]
(214) 485-3500 [Facsimile]

**ATTORNEYS FOR PLAINTIFFS**

## CERTIFICATE OF SERVICE

I hereby certify that on the 22nd day of August, 2016, I electronically filed the foregoing with the Clerk of Court using the CM/ECF which will send notification of such filing to the following:

Mr William Krueger, Attorney
McKamie, Kruer,LLP
500 West lookout Drive
Richardson, Texas 75080
214-253-2600 (Telephone)
214-253-2626 (Facsimile)
bill@mckamiekruegar.com (email)
ATTORNEYS FOR DEFENDANT

/s/ Martin J. Cirkiel
Mr. Martin J. Cirkiel, Esq